GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous Jr., Bar No. 132099
tboutrous@gibsondunn.com
Nicola T. Hanna, Bar No. 130694
nhanna@gibsondunn.com
Poonam G. Kumar, Bar No. 270802
pkumar@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

GIBSON, DUNN & CRUTCHER LLP
Blaine H. Evanson, Bar No. 254338
bevanson@gibsondunn.com
3161 Michelson Drive
Suite 1200
Irvine, California 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

GIBSON, DUNN & CRUTCHER LLP
Miguel A. Estrada (*pro hac vice* forthcoming)
mestrada@gibsondunn.com
1700 M Street, N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8500
Facsimile: 202.467.0539

*Attorneys for Plaintiffs*
*TikTok Inc. and TikTok USDS Joint Venture LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIKTOK INC.; TIKTOK USDS JOINT VENTURE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 2:26-cv-12965<br><br>**COMPLAINT FOR: DECLARATORY AND INJUNCTIVE RELIEF** |

## NATURE OF CASE

1. More than 200 million Americans use TikTok to express themselves, find and build communities, and discover content that gives them valuable information and brings them joy. TikTok provides a platform where people can engage with ideas, pursue their passions, and watch videos on topics "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (citation omitted). TikTok values the expression of every member of its community, including the teens who come to TikTok to safely express their creativity and discover new ideas.

2. TikTok brings that community together through its signature "For You" feed—a presentation of videos that TikTok personalizes for each individual user. To create the For You feed as well as other tailored collections of videos, TikTok exercises editorial discretion over what content to allow, what content to publish to each user, and how to organize and present that content. TikTok employees' curation of third-party videos reflects TikTok's mission, values, and beliefs, as well as TikTok's understanding of what types of content would be most meaningful to its users.

3. Other features of TikTok's platform—including how TikTok curates and presents video content—reflect TikTok's creative design choices and expressive decisions about how to communicate with its users. Its editorial choices and communication with users are protected speech under the First Amendment, and users also enjoy constitutional rights to use and enjoy the platform.

4. California has violated those constitutional rights in two different laws. Two years ago, California enacted Senate Bill 976, which bars TikTok from providing its signature For You feed to Californians under eighteen without obtaining "verifiable parental consent." 2024 Cal. Stat. ch. 321 (codified at Cal. Health & Safety Code §§ 27000-27007) ("S.B. 976"). To justify the law, the Legislature acknowledged that "[s]ocial media provides an important tool for communication and information sharing" but declared it "essential that California act to ensure that social media platforms obtain parental consent." S.B. 976 § 1(a), (g). TikTok's challenge to that law as an

unconstitutional violation of its First Amendment rights and those of its users is pending before the Ninth Circuit. *See TikTok Inc. v. Bonta*, No. 26-5121 (9th Cir. filed Aug. 11, 2026).

5. California has now gone even further. Its latest speech code, Assembly Bill 1709, 2026 Cal. Stat. ch. 183 ("A.B. 1709" or "the Act"), ignores altogether the benefits of online expression for teens. Ostensibly in the name of protecting minors, the Act prohibits TikTok from speaking to under-sixteen users through its current feeds. That ban applies *even if* TikTok obtains the onerous parental consent the State (unconstitutionally) required only two years ago. And the law gives the Attorney General discretion to designate new types of banned expression. Under the State's dictates, TikTok could continue to serve Californians between thirteen and sixteen only by designing a fundamentally different offering.

6. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). That principle applies with full force to minors and adults alike. Protected speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and states have no "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011) (internal quotation marks omitted).

7. By prohibiting TikTok from delivering to under-sixteen users the curated compilations of videos it creates for them, and by dictating how TikTok may present those videos, the Act runs headlong into the First Amendment. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). TikTok thus creates a "distinctive expressive product" every time it delivers a curated collection of videos to a user. *Id.*

TikTok's decision to present that content as a stream of videos is also an expressive choice.

8. Because the Act's restrictions apply based on the content, function, purpose, or effect of TikTok's speech and burden TikTok's and its users' freedom of expressive association, they are subject to strict scrutiny. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). At a minimum, the State must satisfy the heightened burden of intermediate scrutiny applicable to content-neutral regulations of speech.

9. It cannot do so. The State doubtless "possesses legitimate power to protect children from harm." *Brown*, 564 U.S. at 794. But the interests the State invokes to justify its Act are insufficient to survive the heightened First Amendment scrutiny applicable to the Act's speech-restrictive provisions. Beginning with "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music lyrics," or "video games," states—and California in particular—have tried time and again to regulate new forms of expression based on concerns about harm to minors, and courts have time and again struck those regulations down because they conflict with the First Amendment. *Id.* at 797-98. Here, the State cannot link the challenged provisions of the Act to substantial or compelling governmental interests. And even if the State could demonstrate such interests, the Act restricts significantly more expression than necessary to serve those interests. The Act categorically prohibits personalized feeds for users under sixteen without considering the safety tools that TikTok already provides young users and their parents. And it even bans TikTok from providing its feed to users whose parents consent to their use of the platform.

10. TikTok cares deeply about the safety and wellbeing of its teen users. That is why TikTok has *voluntarily* chosen to implement numerous safety features that parents and guardians can use in addition to the many other ways they might control their teens' use of entertainment platforms. In particular, TikTok's "Family Pairing" feature empowers parents and caregivers by offering them extensive tools to use their

own judgment to manage their teens' online experience, including through screen-time limits, privacy settings, content limitations, and the ability to mute notifications or disable usage altogether. TikTok also activates certain safety features by default for minors, including privacy features that allow a user to restrict who can follow her or view her content, as well as "Sleep Hours," a feature designed to limit minors' screen time after 10 p.m. And teens, like all TikTok users, benefit from TikTok's user-personalization because it provides content that TikTok believes is interesting to and appropriate for the user.

11. These safeguards demonstrate that it is possible for teens to safely learn from, connect with, and contribute to the TikTok community in ways that are enriching, educational, and enjoyable. California does not account for the measures TikTok already has in place or the degree of control parents have over their teens' use of the platform—let alone the benefits that teen users themselves enjoy from engaging with TikTok's First Amendment activity or creating their own expression.

12. TikTok shares the desire to protect teens on its platform, but the extreme way the Legislature has gone about it in the Act is not consistent with the First Amendment. By preventing TikTok from providing its users with personalized, expressive collections of videos that they enjoy and learn from, California tramples on TikTok's First Amendment rights and those of its users. This Court should therefore declare that the challenged provisions of the Act are unconstitutional as applied to TikTok and enjoin their enforcement.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiffs' claims arise under the Constitution and laws of the United States. This Court has authority pursuant to 42 U.S.C. § 1983 to grant declaratory and equitable relief because Plaintiffs seek redress for the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States.

14. This Court also has jurisdiction over Plaintiffs' request for declaratory relief, *see* 28 U.S.C. §§ 2201, 2202; Fed. R. Civ. P. 57; and their request for an "injunction[] to protect rights safeguarded by the Constitution," *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)); Fed. R. Civ. P. 65; *accord Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see also Ex parte Young*, 209 U.S. 123, 149 (1908).

15. This Court has personal jurisdiction over Defendant because he resides in and conducts a substantial portion of his official business activities in California.

16. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because the Attorney General is located within this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFFS

17. Plaintiff TikTok Inc. is a California corporation and Plaintiff TikTok USDS Joint Venture LLC is a Delaware limited liability company (collectively, "the TikTok entities" or "TikTok"). TikTok USDS Joint Venture LLC provides the TikTok platform in the United States. Both entities have their principal place of business in Culver City, California.

## DEFENDANT

18. Defendant Rob Bonta is the California Attorney General. Attorney General Bonta is a California resident and is sued in his official capacity. The Act gives the California Attorney General authority to enforce the Act. *See* Cal. Bus. & Prof. Code §§ 22685, 22686.

## FACTUAL BACKGROUND

### I. TIKTOK'S PLATFORM

19. TikTok is one of the most widely used online social and entertainment platforms in the United States, with more than 200 million users in the United States and

1 billion users worldwide. TikTok provides a forum where people can share content with each other on topics "as diverse as human thought." *Reno*, 521 U.S. at 870.

20. TikTok users primarily engage with the platform by creating their own videos and watching, interacting with, and sharing videos recommended to them. Although other platforms also allow people to post and share videos, TikTok is unique in an important respect: TikTok's For You feed presents videos from creators the user has never met, does not follow, and may never have sought out on his own. TikTok thus allows users to discover new creators, subjects, and perspectives without searching for them. And TikTok lets new or little-known creators find an audience on the strength of their content alone rather than preexisting social connections.

21. TikTok users produce enormous volumes of content. For example, in 2025 alone, users in the United States uploaded more than 12 billion videos, which were viewed more than 22 trillion times across the nation and abroad.

22. To serve its mission of inspiring creativity and bringing joy, TikTok carefully evaluates videos to decide which to exclude or promote, using human-designed algorithms to tailor the speech compilation it presents to each user. TikTok does so primarily through its For You feed, which presents a stream of videos curated by TikTok for each individual user. The For You feed is essential to the TikTok experience and one of the defining features of the platform.

23. TikTok uses algorithms to select and compile content for its For You feed and for other feeds. Those algorithms implement at scale purposeful expressive choices made by the human beings who design and engineer the TikTok platform.

24. TikTok users can also access other feeds on the platform, which allow users to personalize the unique content they can view. For example, on the "Following" feed, a user can view a feed of videos generated by creators they choose to follow. And on the "Friends" feed, a user can view videos generated by creators whom the user follows and who follow the user back. Each user's feed is unique to the user.

25. Users can also choose to view feeds based on a particular topic, like the "STEM" feed, which displays content related to science, technology, engineering, and mathematics.

26. Finally, users can view videos based on their searches or comments. For instance, if a person searches for "painting," they can access a feed of videos about painting. Within a category of potentially responsive materials, TikTok then chooses the content to show to the user based on a combination of factors, including relevance to the person's search query and other users' level of engagement with the video.

27. TikTok generally presents the videos in its feeds one after another. When a user wishes to watch something new, he swipes up and another video appears on his screen and starts playing.

28. TikTok's ability to personalize experiences on the platform is what makes such a wide range of content accessible, enjoyable, and appropriate. Its content-moderation and recommendation systems work hand-in-hand to allow TikTok to predict what kinds of videos a person might find informative or interesting and then present those curated videos to that person.

29. That process allows people to curate the content they view. It allows users both to watch content that they might have sought out on their own and to discover content they would otherwise never find. TikTok specifically injects new content into a user's feed to fuel that discovery. For example, if a person tends to watch chemistry-related videos posted by Encyclopedia Britannica, his For You feed might recommend a video by a creator previously unknown to the person, such as Chem Teacher Phil.[1] This feedback loop between an individual's express and implied preferences and available content results in a feed that incorporates expressive choices by both the platform and the individual. In turn, this inspires and fosters creativity from creators, who may be discovered even if they are not already popular.

---

[1] Phillip Cook (@chemteacherphil), TikTok, https://www.tiktok.com/@chemteacherphil (last visited Nov. 4, 2026).

30. In all these ways, TikTok "engage[s] in expression" by providing "feeds" that are "personalized" to each individual. *Moody*, 603 U.S. at 716, 734. As a result, "[o]f the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do." *Id.* at 734.

## II. TIKTOK'S CONTENT CURATION PRACTICES

31. TikTok engages in expression by curating and personalizing people's video feeds through three intertwined mechanisms: (1) content moderation, (2) a proprietary recommendation system, and (3) video promotion and filtering. All three mechanisms involve human decisions about what content to publish, recommend, and promote, while using technology to varying degrees as a tool to implement those decisions at scale. Though discussed separately for the sake of clarity, each mechanism shapes and reinforces the others. For example, part of the content-moderation process includes classifying particular videos as suitable only for some users, and that judgment in turn affects how the recommendation system treats the video with respect to particular users. Using these inextricably intertwined mechanisms, TikTok produces its signature expressive product—a curated collection of videos for each user.

### A. Content Moderation

32. The first process TikTok uses to curate personalized feeds is content moderation. This process includes both a threshold review for compliance with TikTok's baseline safety and policy standards, as well as ongoing moderation that works hand-in-hand with TikTok's recommendation system to help determine whether content is appropriate for a particular user, given information about that user.

33. All user-generated content on the platform is initially reviewed for compliance with TikTok's Community Guidelines, a publicly available collection of rules and standards that apply to all TikTok users and content. TikTok created and continues to refine these guidelines in consultation with third-party experts such as the U.S. Content Advisory Council and the industry's first Youth Council.

34. As those guidelines make clear, TikTok's primary goal is to create a platform "where people discover things they love, build communities, and express themselves."[2] To foster that creative atmosphere, TikTok employs content-moderation practices that are guided by various principles, including restricting content that could lead to "physical, emotional, or . . . financial" harm, encouraging "empathy and dignity," and supporting expression and "creativity."[3]

35. In keeping with those principles, the Community Guidelines prohibit, among other things: nudity; promotion of or incitement of violence; promotion of criminal activities; hate speech, hateful ideology, and hateful behaviors; animal abuse; and harassment and bullying.[4] The Community Guidelines also contain policies against misinformation that could significantly harm individuals or society.[5]

36. TikTok uses both human and technology-based content moderation to implement these Guidelines. All user-generated content uploaded to the TikTok platform first goes through an automated moderation system—one developed, monitored, and refined by employees—before it appears on the platform. While undergoing this review, the content is visible only to the uploader. If the automated moderation technology identifies content that is a potential violation of the Community Guidelines, it will either take action against the content or flag it for review by human moderation teams. When it identifies a clear-cut content violation—for example,

---

[2] TikTok, *Community Guidelines*, https://www.tiktok.com/community-guidelines/en (under "Overview") (last visited Nov. 4, 2026).

[3] TikTok, *Community Principles*, https://www.tiktok.com/safety/en/policies-and-engagement/community-principles (last visited Nov. 4, 2026).

[4] TikTok, *Safety and Civility*, https://www.tiktok.com/safety/en/policies-and-engagement/safety-civility (last visited Nov. 4, 2026); TikTok, *Sensitive and Mature Themes*, https://www.tiktok.com/safety/en/policies-and-engagement/sensitive-mature-themes (last visited Nov. 4, 2026).

[5] TikTok, *Integrity and Authenticity*, https://www.tiktok.com/safety/en/policies-and-engagement/integrity-authenticity (last visited Nov. 4, 2026).

content that depicts graphic violence—the automated moderation technology removes it from the platform without the need for human review. The automated moderation technology can also escalate content for human review.[6]

37. If a moderator determines that content violates the Community Guidelines, appropriate enforcement action is taken. More than 188 million videos were removed from the platform for violating the Community Guidelines between April and June 2026. During that same period, more than 99% of the content TikTok removed for violating the Community Guidelines was taken down before someone reported it, and more than 80% of all videos removed for violating the Community Guidelines were never viewed by a single user.[7] Statistics regarding enforcement of the Community Guidelines are published quarterly on TikTok's website.

38. But content moderation is more than just an across-the-board determination about whether a video can appear on the TikTok platform. During the content-moderation process, TikTok classifies and labels permitted content in ways that determine whether the content can be recommended and to whom. Videos that a moderator determines are not outright prohibited by the Guidelines but that may be unsuitable for a broader audience will be deemed ineligible for recommendation in the For You feed and/or downranked in the platform's search function for some users.

39. In this respect, content moderation works hand-in-hand with the recommendation system. Using what it knows about a video and about users, TikTok makes ongoing judgments about whether it would be appropriate to recommend a particular video to a particular user. For example, a video depicting adults smoking cigarettes does not violate the Community Guidelines, but moderation might still

---

[6] TikTok, *Our Approach to Content Moderation*, https://www.tiktok.com/safety/en/policies-and-engagement/content-moderation (last visited Nov. 4, 2026).

[7] TikTok, *Community Guidelines Enforcement Report: April-June 2026*, https://www.tiktok.com/safety/en/transparency/cg-report (last visited Nov. 4, 2026).

classify it as inappropriate for young users. Such content would not be recommended to any person who registers as under the age of eighteen.[8]

40. Together, content moderation and personalization allow TikTok to keep more speech on its platform. If TikTok could not use a user's age and other attributes in deciding whether a video is appropriate for that user, TikTok might need to moderate its content pool with the most sensitive user in mind. The result would be a platform that suppresses speech that is entirely appropriate for, and of interest to, adults and older teens.

41. Finally, TikTok's content-moderation process also gives users more information about whether or not they want to view a particular clip. Videos that some people might find distressing but that involve a matter of public interest are covered by "opt-in viewing screens" that warn the viewer that the video may contain sensitive material. Those videos are also ineligible for recommendation in the For You feed.

**B. Recommendation System**

42. The second process TikTok uses to personalize video feeds is content recommendation. Content is recommended to users through TikTok's proprietary recommendation system, a sorting and ranking mechanism that TikTok's employees designed and constantly update to select videos for an individual's For You feed.

43. To determine what content the TikTok platform presents to a particular person, the recommendation system analyzes various signals from that person and others they might interact with, such as their likes, comments, and what they watch, then matches those signals to the content that TikTok has determined is eligible for recommendation in the For You feed. At a high level, the recommendation system identifies a pool of candidate videos for a person and then scores and ranks those videos to determine which particular videos would be most interesting and informative to that individual. Again, the recommendation system works hand-in-hand with TikTok's

[8] TikTok, *Teen Safety and Well-Being* (last updated Apr. 2025), https://ads.tiktok.com/help/article/tiktok-ads-policy-youth-safety.

content-moderation process. TikTok engineers designed the recommendation system to exclude content that violates the Community Guidelines or is ineligible for recommendation to a particular user from the candidate pool.

44. TikTok's product designers and engineers developed the models included in the recommendation system to consider a variety of factors when attempting to identify videos for an individual's For You feed, including the individual's engagement or activity information (like video playtime, likes, shares, accounts followed, comments, and content created), account and device information (such as language preference and country setting), and video information (such as captions, sounds, and hashtags), which determine how the system ranks videos. The factors considered each reflect TikTok's editorial judgments about what third-party content should appear in users' feeds to inspire creativity and bring joy to that user, while minimizing the risk of harm. And TikTok may adjust how the system considers different factors depending on, among other things, how a factor will further TikTok's mission and business goals.

45. The development of the recommendation system is an ongoing process, evolving as employees refine models, reassess influential factors based on users' feedback, research, and data analysis, and optimize the system to better reflect TikTok's expressive choices. For example, employees may refine the model to attract a broad array of individuals and to provide existing users with more informative and useful content, in addition to content that is enjoyable and entertaining. The overarching goal of the recommendation system's refinement remains the same: to inspire creativity and joy among those on the platform.

46. The For You feed's personalized recommendation system is critical to the TikTok platform and reflects TikTok's unique expressive choices about what content to present and how to present it. Without this personalization, people would likely see content that they are not interested in or that is not appropriately tailored to them.

47. TikTok also helps to inform its users about why content might be recommended to them. Potential reasons include: "You commented on, liked, shared,

or watched similar posts"; "This post is popular in your country"; "This post was created recently"; "This video is longer, and you seem to like longer videos"; and "You're following the creator."

48. Beyond that, TikTok sheds light on the editorial decisions it makes that prevent a user's feed from concentrating on one topic. For example, TikTok tells users, "sometimes you may come across a video in your feed that doesn't appear to be relevant to your expressed interests or have amassed a huge number of likes. This is an important and intentional component of our approach to recommendation: bringing a diversity of videos into your For You feed gives you additional opportunities to stumble upon new content categories, discover new creators, and experience new perspectives and ideas as you scroll through your feed."[9]

49. TikTok also allows people to provide feedback that shapes the content that they see. For example, a person can tap a button on a video that says "Not interested" or refresh their For You feed. An individual can also provide filter words to reduce or help eliminate certain kinds of content and adjust preferences for subject-matter categories as well. Family Pairing extends similar content-control options to the parents of teen users.

### C. Video Promotion and Filtering

50. Video promotion and filtering is the third process TikTok uses to determine which content is shown to its users. As part of that process, TikTok may promote specific content. Employees hand-select individual video categories that they want to promote and submit to TikTok supervisors a request to do so. Each promotion request in the United States is manually reviewed by a U.S.-based reviewer. As a guiding principle, TikTok exercises judgment to elevate content that is original, notable, educational, trustworthy, and engaging.

[9] TikTok, *How TikTok Recommends Videos #ForYou* (June 18, 2020), https://newsroom.tiktok.com/how-tiktok-recommends-videos-foryou.

51. TikTok also applies rules to filter out and disperse certain content—*i.e.*, to prevent the For You feed from showing numerous consecutive videos that all involve the same subject and to promote higher-quality content. For example, TikTok implements rules that prioritize content from the same country a person is in, avoid duplication, and promote appropriate video length. Rules like these are intended to filter out content that is low quality (like extremely short videos), to prevent people from seeing videos only about a particular topic, and to encourage discovery of new topics and interests.

**D. Other Expressive Aspects of TikTok's Platform**

52. In addition to TikTok's core, expressive content-curation activities, TikTok engages in other expressive activity related to its platform.

53. To begin, TikTok makes expressive choices with respect to how to present the curated video collections to users. TikTok generally chooses to present a stream of videos to users without breaking up videos into discrete pages or batches. The For You feed's recommendation system refines the content-personalization process in real time, allowing TikTok's recommendations to adapt to a user's current interests. A natural rather than segmented feed is essential to create TikTok's signature "For You Page" experience, which is centered on users discovering accessible, enjoyable, and appropriate content made by creators with whom a person may have no pre-existing relationship.

54. TikTok also communicates to users information about the content on its platform and the engagement of other users with that content. For example, TikTok displays to users metrics such as likes, comments, reposts, shares, and followers—metrics that convey information to users about how other TikTok users have interacted with the speech on TikTok's platform. A like count, for instance, communicates that other users have reacted favorably to a video; a comment is another user's speech about a video; a repost or share count communicates that other viewers considered the video worth circulating to others; and follower counts communicate the size of the audience

that has chosen to receive a user's expression. TikTok communicates this information to enable users to understand and contextualize the speech on its platform.

55. TikTok also communicates with its users through "push notifications," which are messages that TikTok sends to users even when users are not actively looking at the TikTok platform. Through these notifications, TikTok communicates information to its users in real time—for instance, alerting a user when someone else has interacted with one of their videos or when a content creator the user follows has posted a new video.

## III. TIKTOK'S SAFETY MEASURES FOR TEEN USERS

56. TikTok believes that teens can safely learn from and contribute to the TikTok community. On TikTok, teens can explore their interests, learn new things, connect with others who share their passions, and begin to learn how to express themselves to people of different backgrounds.

57. TikTok also recognizes that families differ in how and when they want their teens to begin expressing themselves online. Parents decide, based on their family's values and their knowledge of their child's maturity and needs, whether and how to provide their child with access to the internet. Those decisions begin with whether the child may have a smartphone at all, and if so, at what age. From there, parents design household rules about where and when the device may be used. Phones might be off-limits all night or until homework is finished. And parents set consequences for violating those rules. Parents who choose to give their child internet access can also make decisions about how the child uses it. Smartphones and tablets include built-in parental controls that allow parents to make decisions about the apps a child can download and how long the child can use each app.[10] On top of that, parents can choose

---

[10] *See, e.g.*, Apple, *Child Safety*, https://www.apple.com/child-safety/ (last visited Nov. 4, 2026); Google, *Parental Controls*, https://safety.google/settings/parental-controls/ (last visited Nov. 4, 2026).

to enable third-party monitoring software or home network controls to monitor their child's internet access.[11]

58. For teens able to access the TikTok platform, TikTok uses two primary mechanisms to foster a safe and healthy environment: (1) setting certain default safety measures for users who register as under eighteen, and (2) empowering parents, guardians, and other caregivers ("parents," for the sake of brevity here) to manage their teens' online experience.

59. New users must provide their date of birth to create a TikTok account. Users who register as under age thirteen in the United States are automatically directed to an age-appropriate and private experience where they can view content curated specifically for younger people, but they generally cannot interact with other users. Users under thirteen can like videos, but they cannot comment on those videos, share videos with others, or send and receive messages. They can create videos, but they cannot post them. And their screen time on the app is limited to one hour, unless a parent approves additional time.[12]

60. Beyond those limits, TikTok allows parents to tailor and supervise their teen's online experience through its Family Pairing feature. Family Pairing lets parents customize their teen's safety settings based on what they deem appropriate for their family by linking their account to their teen's account.

61. Through Family Pairing, parents can: set daily screen time limits or schedule breaks; see summaries of their teen's time spent on the platform; filter keywords; enable Restricted Mode (discussed below); receive notifications about their teen's account activity; customize search capabilities; decide whether their teen's account will be public or private; determine whether their teen's account can be

---

[11] *See, e.g.*, Bark, *Bark App*, https://www.bark.us/bark-app/ (last visited Nov. 4, 2026); Verizon, *Fios Parental Controls FAQs*, https://www.verizon.com/support/residential/internet/essentials/fios-parental-controls-faqs/ (last visited Nov. 4, 2026).

[12] TikTok, *TikTok Under 13 Experience*, https://www.tiktok.com/support/faq_detail?id=7543604789335071238&category=web_account (last visited Nov. 4, 2026).

recommended to others; restrict who can send direct messages to their teen or turn off direct messaging entirely; decide who can view their teen's liked videos; and decide who can comment on their teen's videos.

62. In other words, Family Pairing offers a host of controls through which parents can fine-tune their teen's experience using their own best judgment about their teen's maturity and needs. At a more restrictive end of the spectrum, for example, parents of a thirteen-year-old who is just starting to explore social media might choose to limit their child's screen time to 30 minutes per day, make his account private, disable direct messaging, disable unconnected users from engaging with their child's account, and filter out search terms for inappropriate content. By contrast, parents of a fifteen-year-old aspiring violinist who enjoys connecting and creating with other musicians might allow her 60 minutes of screen time per day and allow her to engage with other unconnected users, while still disabling the application during school or nighttime hours.

63. In addition to Family Pairing, TikTok offers other safety features to protect teenagers on the platform. These include:

64. **Restricted Mode**—Teenagers and their parents (through Family Pairing) as well as all other users can use Restricted Mode to limit a person's exposure to content that contains mature or complex themes, such as content containing profanity, sexual themes, violence, or illegal substances. Some platform features are also made unavailable when a person enables Restricted Mode, including access to the Following feed. Restricted Mode is available as an opt-in feature.

65. **Search Interventions**—When a teenager or any other user searches for certain words or phrases, such as "suicide," TikTok will direct them to local support resources such as the Crisis Text Line, where they can find support and information for treatment options.

66. **Private Account**—If a user designates their account as Private, the user can approve or deny follower requests and choose people who are allowed to (1) follow them, (2) watch their videos, and (3) see their bios, likes, followers, and following lists.

If an account is Private, others cannot download or directly interact with that individual's content in their own video (also known as "Dueting" or "Stitching"). All user accounts for people who register as under eighteen are Private by default. Additionally, parents can control their teens' private account settings through Family Pairing.

67. **Well-Being Guide—**TikTok provides a toolkit to help users control their platform experience and interact with technology in a way that feels right for them. The guide encourages people to assess how their digital habits impact their physical and mental health by, among other things, reflecting on screen time, assessing their emotional state, evaluating their online privacy and security practices, and considering the content they consume online. TikTok provides prompts to help individuals reflect, points people to the tools available to manage their platform time, and offers tips and resources for those struggling with mental health.

68. **Safety Centers—**TikTok provides a Safety Center that offers tools and controls to help manage users' experiences, including pages on topics such as tragic-event support and countering hate speech and behavior, as well as guides with safety tips. TikTok also provides a Teen Safety Center with guidance on the safety features teens can use to keep their accounts protected and control with whom they interact.

69. **Daily Screen Time—**Daily Screen Time allows all individuals to set limits for how much time they spend on the platform. People may view their screen time summary in their activity center.

70. **Screen Time Default Settings for Minors—**For users who register as under eighteen, Daily Screen Time is automatically enabled by default and set to 60 minutes. Parents can adjust their teens' screen-time limits through Family Pairing.

71. **Screen Time Breaks—**When enabled, Screen Time Breaks allow people to schedule reminders to take a break from using the platform after a set period of time. Once a person reaches a predetermined amount of screen time, the person is notified with a popup to consider taking a break.

72. **Sleep Hours**—Sleep Hours helps people wind down and prepare for bedtime. If a teen who registers as under sixteen is on the TikTok platform after 10 p.m., their For You feed will be interrupted with the Sleep Hours feature, which will launch a full-screen takeover with calming music to help teens relax and be mindful of the time. If a teen decides to spend additional time on the TikTok platform after the first reminder, the platform will show a second, harder to dismiss, full-screen prompt.

## IV. A.B. 1709—CALIFORNIA'S RESTRICTIONS ON EXPRESSIVE FEATURES FOR USERS UNDER SIXTEEN

73. On September 10, 2026, California's governor signed A.B. 1709 into law. The Act adds a new chapter to the Business and Professions Code, entitled "Covered Platform Age Restriction." Cal. Bus. & Prof. Code §§ 22682-22686. The Act is scheduled to take effect on January 1, 2027. *See* Cal. Const. art. IV, § 8(c)(1).

74. The Act's goal is clear. As one legislator put it, "We're banning social media from accessing children."[13] One of the Act's legislative findings likewise claims that "[e]stablishing a minimum age requirement for social media use is a reasonable and evidence-based measure . . . ." A.B. 1709 § 1(n).

75. A.B. 1709's central requirement is its dictate that "[a] covered platform shall not provide an addictive feature to a user who is under 16 years of age." Cal. Bus. & Prof. Code § 22683(a)(1).

76. That requirement borrows language from an earlier law—the Protecting Our Kids from Social Media Addiction Act, known as S.B. 976. *See supra* ¶ 4. As relevant here, that law makes it unlawful for social-media companies like TikTok to provide an "addictive feed" to a user under eighteen in California unless the platform

---

[13] Cory Smith, *California Lawmakers Pass Bill to Keep Kids Off 'Addictive and Harmful' Social Media*, ABC News 4 (Sept. 1, 2026), https://abcnews4.com/news/nation-world/california-lawmakers-pass-bill-to-keep-kids-off-addictive-and-harmful-social-media.

"has obtained verifiable parental consent." Cal. Health & Safety Code §§ 27000.5(a), (d), 27001(a)(2).

77. An "addictive feed" under S.B. 976 is a feed in which media is "recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device," subject to several narrow exceptions. Cal. Health & Safety Code § 27000.5(a). In other words, the law restricts minors' access to personalized feeds absent parental consent.[14]

78. Although A.B. 1709 borrows S.B. 976's definition of "addictive feed" and cross-references the statute in one place, *see* Cal. Bus. & Prof. Code § 22684(a)(2), A.B. 1709 enacts an independent regime that goes well beyond S.B. 976. A.B. 1709 reenacts S.B. 976's anti-personalization definition of "addictive feed" as a freestanding provision in the California Business and Professions Code and treats the term as part of a broader, new category of "[a]ddictive feature[s]." *Compare* Cal. Bus. & Prof. Code §§ 22682(a)(1), (b), 22683(a)(1), *with* Cal. Health & Safety Code §§ 27000.5(a), 27001(a)(2). The Act defines an "[a]ddictive feature" as "any of the following psychologically exploitative features intended to maximize engagement that foreseeably lead to compulsive use: (1) An addictive feed[,] (2) Autoplay[,] (3) Any other feature defined in regulations adopted [by the Attorney General] as an addictive feature." Cal. Bus. & Prof. Code § 22682(a).

79. The breadth of A.B. 1709's new restrictions on how social-media companies communicate with users cannot be overstated. New requirements without a counterpart in S.B. 976 include A.B. 1709's freestanding autoplay ban, as well as an account- and data-deletion mandate. Cal. Bus. & Prof. Code §§ 22682(a)(2), 22684(b). A.B. 1709 also departs from S.B. 976 by omitting any parental-consent exception. A.B.

[14] Challenges to S.B. 976, including a lawsuit by TikTok, remain pending. *See TikTok Inc. v. Bonta*, No. 26-5121 (9th Cir.). TikTok maintains that S.B. 976's restrictions—including its ban on California minors' access to personalized feeds absent "verifiable parental consent"—are unconstitutional.

1709 prevents a "[c]overed platform" from providing "addictive features" even if a minor's parent consents to the minor's use of the feature. *Compare* Cal. Bus. & Prof. Code § 22683(a)(1), *with* Cal. Health & Safety Code § 27001(a)(2).

80. Subject to regulations adopted by the Attorney General, a "[c]overed platform" is "an internet website, online service, online application, or mobile application, including, but not limited to, a social media platform, as defined in Section 22675, that offers users or provides users with an addictive feature as a significant part of the service provided by that internet website, online service, online application, or mobile application." Cal. Bus. & Prof. Code § 22682(c)(1). Section 22675, in turn, defines a "[s]ocial media platform" as a public or semipublic internet-based service or application that has users in California, a substantial function of which is to connect users to interact socially with each other, and that allows users to construct a public or semipublic profile, populate a list of other users with whom they share a social connection, and create or post content viewable by other users. *Id.* § 22675(f).

81. A "[u]ser" is "a natural person who resides in the state and accesses or seeks to create an account on a covered platform." Cal. Bus. & Prof. Code § 22682(f). The Act thus applies based on a person's residence, not his location as is the case under S.B. 976. *See* Cal. Health & Safety Code § 27000.5(d).

82. A.B. 1709 is enforceable through civil actions brought by the Attorney General or "a local public prosecutor." Cal. Bus. & Prof. Code § 22686(a). This enforcement scheme is yet another feature of A.B. 1709 that goes beyond even S.B. 976. Unlike S.B. 976, A.B. 1709 sets forth substantial per-minor penalties. *Compare id.* § 22686(b), *with* Cal. Health & Safety Code § 27006(a). A covered platform that violates A.B. 1709 is subject to civil penalties of "[u]p to fifty thousand dollars ($50,000) per affected minor for a knowing violation" and "[u]p to twenty-five thousand dollars ($25,000) per affected minor for a negligent violation." Cal. Bus. & Prof. Code § 22686(b).

83. TikTok meets A.B. 1709's definition of a "covered platform" and provides services to users in California who identify as under sixteen. TikTok accordingly has an actual and well-founded fear that A.B. 1709 will be enforced against it.

**A. Personalization Ban**

84. The Act's central prohibition provides that "[a] covered platform shall not provide an addictive feature to a user who is under 16 years of age." Cal. Bus. & Prof. Code § 22683(a)(1). Among the features identified as "addictive" are so-called "addictive feed[s]." *Id.* § 22682(a)(1).

85. An "[a]ddictive feed" is "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." Cal. Bus. & Prof. Code § 22682(b).

86. That definition describes feed personalization, the process by which TikTok curates content across its platform. *See supra* ¶¶ 31-51. TikTok relies on information like a user's video playtime, likes, shares, accounts followed, comments, and content created to curate videos for an individual user. *See supra* ¶¶ 43-44. In the Act's words, TikTok "recommend[s], select[s], or prioritize[s]" videos for display to a user "based . . . on information provided by the user, or otherwise associated with the user or the user's device." Cal. Bus. & Prof. Code § 22682(b).

87. Although the Act includes several narrow carveouts from its definition of an addictive feed, *see* Cal. Bus. & Prof. Code § 22682(b)(1)-(7), the alternatives are no substitute for the personalized feed that TikTok offers. The information TikTok uses to personalize the feed is persistently associated with the user and concerns the user's "previous interactions with media generated or shared by others," *id.* § 22682(b)(1). It is not limited to non-persistent search terms, *id.* § 22682(b)(2), or to privacy or accessibility settings, technical device information, or signals about whether the user is

a minor, *id.* § 22682(b)(3). And TikTok feeds are not confined to media the user "expressly and unambiguously requested," to direct messages, to "the next media in a preexisting sequence," or to selections "necessary to comply with" the Act. *Id.* § 22682(b)(4)-(7). The Act therefore forbids TikTok from providing its personalized feeds to any California user under sixteen. *Id.* §§ 22682(a)(1), (b), 22683(a)(1).

88. A.B. 1709 also burdens the rights of TikTok's users. It deprives users under sixteen of the curated compilations of speech they choose to receive, and it deprives creators of the ability to reach those users through TikTok's personalized feeds—a principal way creators on TikTok find an audience beyond their existing followers. By preventing TikTok from delivering the curated speech compilations it creates for its users, A.B. 1709's anti-personalization requirement burdens TikTok's expressive choices and its users' ability to receive the content they want to see and hear. *See Moody*, 603 U.S. at 731.

89. Moreover, A.B. 1709's prohibition is absolute. The State does not even incorporate the (also unconstitutional but less restrictive) parental-consent regime that S.B. 976 adopted. The consequence is that a parent who has reviewed TikTok's platform, linked her account to her fifteen-year-old's account through Family Pairing, set a 30-minute daily screen-time limit, enabled Restricted Mode, and concluded that a personalized For You feed introducing her daughter to new musicians and science educators is appropriate for her family has no ability under California law to make that choice. Nor does the fifteen-year-old daughter have any say in her online expression.

90. A.B. 1709 thus renders irrelevant the safety tools that TikTok has built. *See supra* ¶¶ 59-72. It also departs, without explanation, from the (already unconstitutional) parental-consent model the State adopted in S.B. 976, thereby restricting even more constitutionally protected speech than even the State previously deemed necessary. *See supra* ¶¶ 76-79.

91. A.B. 1709 would also strip TikTok of one of its most important tools for keeping teens' feeds age-appropriate without restricting content that other users want to

see. TikTok uses personalization not only to identify content a user may want to see, but also combines personalization with content moderation to avoid showing content a particular user likely will not want to see—or that, in TikTok's judgment, that user should not see. *See supra* ¶¶ 38-39. Absent personalization, TikTok could not identify the users for whom such content should be excluded or disfavored. Put between a rock and a hard place, TikTok might be forced to restrict more speech on its platform to account for the most sensitive user or publish speech to everyone that, while appropriate for some users, it otherwise would choose not to display to different users. *See supra* ¶ 40. A.B. 1709's exception from its personalization ban of "signals concerning whether the user is a minor," Cal. Bus. & Prof. Code § 22682(b)(3), does not change that reality. Even if TikTok could still determine whether a particular user is a minor, that information might not allow TikTok to distinguish one minor from another. TikTok might have to treat *every* minor as though he were the youngest and most sensitive user on the platform, even though a seventeen-year-old's needs and interests may differ markedly from a fourteen-year-old's. The Act would then suppress speech that may well be of interest to, and appropriate for, older teens.

**B. Other Design Restrictions**

92. A.B. 1709's ban on "addictive feature[s]" does not stop with personalized feeds.

**1. The Autoplay Ban**

93. Apart from its ban on personalized feeds, the Act prohibits covered platforms from providing "[a]utoplay" to users under sixteen. Cal. Bus. & Prof. Code §§ 22682(a)(2), 22683(a)(1).

94. The Act does not define "autoplay," but elsewhere refers to audio or video content that is "automatically played." Cal. Bus. & Prof. Code § 22682(b)(4), (6).

95. TikTok's feeds generally present the videos in its feeds one after another. When a user wishes to watch something new, he swipes up and another video appears

on his screen and starts playing. *See supra* ¶¶ 27, 53. There is a risk that California regulators would consider TikTok's design to violate the autoplay ban.

96. A.B. 1709 thus may be enforced in a way that dictates not only what TikTok may show California users under sixteen, but how TikTok may show it. Like a newspaper, a social-media feed is "more than a passive receptacle or conduit" for others' speech, and "the decisions made as to limitations on the size and content" of the collections of videos displayed on a platform "constitute the exercise of editorial control and judgment." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). The law threatens TikTok's editorial, expressive decisions with respect to how TikTok displays content.

**2. Other "Addictive Features"**

97. A.B. 1709 also prohibits TikTok from sharing content with Californians under sixteen via "[a]ny other feature" the Attorney General designates as an "addictive feature." Cal. Bus. & Prof. Code § 22682(a)(3).

98. The Act does not explain how the Attorney General should determine whether a feature is "addictive." It directs only that the Attorney General's regulations must "further the purpose of protecting minors online," Cal. Bus. & Prof. Code § 22685(a), and describes "addictive feature[s]" as "psychologically exploitative features intended to maximize engagement that foreseeably lead to compulsive use," *id.* § 22682(a). Adding to the uncertainty is the Act's failure to require any delay between a newly designated "addictive feature" and liability for providing that feature.

99. TikTok thus faces the prospect that additional features it has long used to communicate with users—such as its ranking of comments or its interpretation of search queries—could be prohibited for users under sixteen immediately and without further action by the Legislature and based solely on the conclusion of the Attorney General. TikTok could then face penalties of up to "$25,000" "per affected minor" for "negligent[ly]" failing to anticipate the new feature ban. Cal. Bus. & Prof. Code § 22686(b)(2).

**C. Age Verification, Account Deletion, and Data Deletion**

100. Aside from its central ban on the expressive products that TikTok offers, the Act also imposes a host of new restrictions on the way TikTok can interact and communicate with its users.

101. First, "[b]efore providing an addictive feature to a user"—of any age—TikTok must "verify the age of a user pursuant to the Digital Age Assurance Act," Cal. Civ. Code § 1798.500 *et seq.*, "subject to any regulation adopted by the Attorney General," Cal. Bus. & Prof. Code § 22684(a)(1). The Act therefore conditions every Californian's access to TikTok's personalized feed on age verification.

102. Further, if TikTok "is unable to verify the age of the user" through that process, it must "instead rely on the age determination" required by S.B. 976. Cal. Bus. & Prof. Code § 22684(a)(2) (citing Cal. Health & Safety Code § 27001(a)(1)(B)). The Act does not explain when a platform is "unable to verify" a user's age.

103. Second, the Act requires covered platforms to "implement reasonable measures to ensure that users under 16 years of age are not provided any addictive feature." Cal. Bus. & Prof. Code § 22683(b). It does not define "reasonable measures."

104. Third, the Act requires TikTok to "delete the account of a user under 16 years of age and any personal information associated with the user of the account" unless the platform maintains that account without providing "any addictive feature." Cal. Bus. & Prof. Code §§ 22683(a)(2), 22684(b). The Act does not say when deletion must occur.

105. Account deletion would remove that user's published expression from TikTok, depriving the user of the ability to speak to his audience and depriving that audience of the ability to receive his speech. And deleting the "personal information associated with" accounts would erase information that TikTok uses to curate content.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of First and Fourteenth Amendments, as Applied—

### Ban on Personalized Feeds

### (42 U.S.C. § 1983 and Equitable Cause of Action)

106. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

**A. TikTok's Personalized Feeds Are Protected by the First Amendment.**

107. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody*, 603 U.S. at 731.

108. TikTok's "choices about what third-party speech to display and how to display it" are "editorial choices" protected by the First Amendment. *Moody*, 603 U.S. at 716. TikTok "create[s] a distinctive expressive offering" when it delivers to each of its users a personalized For You feed that TikTok has curated based on its Community Guidelines, mission, and values, as well as data about individual users' interests. *Id.* at 738. TikTok's STEM feed and LIVE feed are personalized compilations of the same kind: each presents videos or live streams that TikTok has selected and ordered for the individual user based on TikTok's assessment of what that user will find valuable within the feed's subject matter.[15]

109. TikTok's personalized feeds are designed based on the editorial judgments of TikTok's flesh-and-blood employees—judgments that reflect TikTok's policies about permissible content as reflected in its Community Guidelines, TikTok's views as to important, high-quality content that ought to be promoted or disseminated more widely

---

[15] While the precise scope of the Act is unclear, TikTok has standing to challenge it because TikTok intends "to engage in a course of conduct"—selecting and displaying personalized content to its users that they are likely to engage with and enjoy—that is at least "arguably proscribed by" the statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-62 (2014) (internal quotation marks omitted).

or to particular users, and TikTok's mission and business goals. Essential to TikTok's speech product is TikTok's choice to *personalize* its expressive offerings, and thereby to "include and exclude, organize and prioritize," *Moody*, 603 U.S. at 716, based on individual users' characteristics and interests. While TikTok uses algorithms to efficiently provide its speech products to millions of users, those algorithms reflect "human beings' inherently expressive choice[s]" with respect to what content to disseminate and how to display it. *Id.* at 746 (Barrett, J., concurring).

110. TikTok's personalized feeds are expressive and protected by the First Amendment simply because TikTok has decided what media will be "included in or excluded from" those "compilation[s]" and has "organiz[ed] and present[ed] the included items." *Moody*, 603 U.S. at 731. It does not matter whether TikTok's feeds convey specific articulable messages. That is because "[a] narrow, succinctly articulable message is not a condition of constitutional protection," and a curated collection of others' expression is protected even when, as with the "unquestionably shielded painting of Jackson Pollock," no particular message can be isolated from it. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). "[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Id.* at 569-70. No further inquiry is required to conclude that TikTok's personalized feeds are protected by the First Amendment.

111. Even if an articulable message were required before a collection of content qualified for First Amendment protection, TikTok *does* communicate numerous messages through its personalized feeds.

112. First, TikTok's personalized feeds do not merely reflect TikTok's predictions as to what users will enjoy. Rather, TikTok affirmatively shapes its feeds to communicate specific messages. TikTok employees hand-select specific content to promote—*e.g.*, highlights from a championship game, videos from a major cultural event, content from STEM educators and other creators TikTok deems worthy of a wider

audience—because they judge that content to be valuable. TikTok then delivers that content through its personalized feeds to the particular users TikTok believes should receive it. That content promotion is an endorsement of specific videos as worthy of dissemination, and it is more plainly expressive even than the message implicit in every personalized recommendation: "we think you will find this content useful, interesting, or relevant." That TikTok considers the characteristics of its audience as one of many factors in deciding what to promote does not strip those choices of First Amendment protection, any more than a newspaper editor's consideration of her readership's preferences strips protection from her front page.

113. Second, all personalized feeds also convey the expressive message that TikTok has selected this content for this user because TikTok believes the user will find it interesting or relevant, and the content is appropriate for this user. That is true even if TikTok simply chose videos for a user that it thinks the user will like. But TikTok goes beyond just showing users what they already like. It also chooses *not* to show users content TikTok believes could be harmful to them given their particular characteristics—for example, by dispersing repetitive content about dieting or sadness in a teenager's feed. TikTok thus delivers through its personalized feed messages about the content that will be interesting, relevant, and appropriate for each user.

114. TikTok's expression receives full constitutional protection even though that speech is shaped in part by TikTok's users and even if TikTok could not predict precisely what content will be published to a particular user. Speech does not lose protection because it considers audience feedback as part of an iterative creative process. Think of the "choose-your-own-adventure stories" that allow readers to "make decisions that determine the plot by following instructions about which page to turn to." *Brown*, 564 U.S. at 798. Or consider an art installation that invites visitors to cover a white space with bright stickers, resulting in "an explosion of colour."[16] Like the installation artist

[16] Tate, Yayoi Kusama's Obliteration Room, https://www.tate.org.uk/art/artists/yayoi-kusama-8094/yayoi-kusamas-obliteration-room (last visited Nov. 4, 2026).

who designs the space and specifications for the stickers but leaves the ultimate output up to audience preference, TikTok expresses itself by setting the rules for how its content will be ordered. In each case, the artist cannot predict the final experience that any user will have, but the work is no less expressive. A platform that publishes collections of speech receives First Amendment protection even if it does "not know specifically" the content of its compilations. *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 568 (9th Cir. 1984).

115. TikTok's choices in the design of its personalized feeds to "include and exclude, organize and prioritize," *Moody*, 603 U.S. at 716, are the essence of editorial discretion protected by the First Amendment.

**B. The Act Prohibits TikTok's Speech, Triggering First Amendment Scrutiny.**

116. The Act completely bans TikTok from delivering to any Californian who is under sixteen compilations of media "recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." Cal. Bus. & Prof. Code § 22682(b). The prohibition is not a default setting. It is a total ban.

117. Because TikTok's For You feed, STEM feed, and LIVE feed recommend, select, or prioritize content for users based at least in part on information about the user, the Act prohibits TikTok from providing those feeds to users under sixteen. Cal. Bus. & Prof. Code § 22683. To comply, TikTok must either cease providing its feeds to under-sixteen users altogether, *id.* § 22683(a), or present those users with content seemingly at random, in reverse chronological order, or according to some other non-personalized criterion the State deems permissible, *id.* § 22682(b)(1)-(7). The Act's blanket ban on personalization thus overrides TikTok's "editorial choices" "about what third-party speech to display and how to display it" and is an "effor[t] to alter [TikTok's] edited compilation[s] of third-party expression." *Moody*, 603 U.S. at 716-17. While TikTok would prefer to continue providing personalized feeds to these users, the Act would force TikTok to change its expressive product—to change its speech. The Act is

therefore "subject to judicial review for compliance with the First Amendment." *Id.* at 717.

118. The Act's ban is a "[c]ontent-based" regulation of speech that is "presumptively unconstitutional" and subject to strict scrutiny. *Reed*, 576 U.S. at 163. A law is content-based if it "targets speech based on its communicative content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (brackets omitted). If a law's applicability turns on "the topic discussed" or "the idea or message expressed," the law is "obvious[ly]" content based. *Id.* at 69, 74 (quoting *Reed*, 576 U.S. at 163). A law that turns on the speech's "function or purpose" is a "subtler"—but no less unconstitutional—form of content-based discrimination, at least when that consideration "achieves the same result" as subject-matter or topic discrimination. *Id.* (discussing *Reed*, 576 U.S. at 163).

119. The Act's ban on personalized feeds is content-based under these standards. The ban applies to one category of expressive product—*personalized* feeds—the "function or purpose" of which is to provide collections of content that are tailored to the individual user. *Reed*, 576 U.S. at 163. The Act reaches only those features that are "intended to maximize engagement," Cal. Bus. & Prof. Code § 22682(a)—which is a classification based on a feed's "function or purpose," *Reed*, 576 U.S. at 163. Further, the ban "cannot be justified without reference to the content of the regulated speech," *id.* at 164 (internal quotation marks omitted), as its entire purpose is to stop minors from seeing certain types of content—content that has been selected at least in part based on their interests and characteristics—because of the effect that the Legislature believes such content has on minors. *See* A.B. 1709 § 1(a)-(k) (describing alleged harmful effects of social media). "The emotive impact of speech on its audience is not a 'secondary effect' "; regulations justified based on the impact of speech on those who receive it are "content-based." *Boos v. Barry*, 485 U.S. 312, 321 (1988).

120. The Act is also speaker-based. While "not all speaker-based laws are subject to strict scrutiny," a "speaker preference is problematic . . . if it reflects a content

preference." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1017 (9th Cir. 2025) (internal quotation marks omitted). A.B. 1709's speaker distinctions do just that. The Act exempts from the definition of "covered platform" services whose user interactions are "limited to commercial transactions or to consumer reviews" and services that "operate[] a feed for the primary purpose of cloud storage," Cal. Bus. & Prof. Code § 22682(c)(2)(A)-(B), and it authorizes the Attorney General to "alter the scope of 'covered platform'" by regulation, *id.* § 22685(b). A personalized feed of product reviews is thus permitted for a fifteen-year-old while a personalized feed of science videos is not. A distinction of that sort is not one that is "agnostic as to content." *NetChoice*, 152 F.4th at 1017. Rather, speaker-based distinctions that effectively allow personalized feeds consisting of some content but not others "reflect[] a content preference" and independently trigger strict scrutiny. *Reed*, 576 U.S. at 170.

121. Even if the Act's ban on personalized feeds were content-neutral, intermediate scrutiny would apply because it is "a restriction on speech or expression" protected by the First Amendment. *See, e.g.*, *Reagan Nat'l Advert.*, 596 U.S. at 76.

**C. The Act's Ban on Personalized Feeds Cannot Survive First Amendment Scrutiny.**

122. The Act fails strict scrutiny because the State cannot meet its burden to prove that the ban is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. The State "must specifically identify an 'actual problem' in need of solving," and the curtailment of speech "must be actually necessary to the solution." *Brown*, 564 U.S. at 799 (citation omitted). California cannot satisfy this burden.

123. First, the State has no compelling interest in forcing TikTok to stop providing personalized content to its teenage users, stop promoting content it believes those users should see, and instead provide them only with speech that is *less* relevant or useful to them. There is no evidence that personalized feeds—as distinct from social-media use generally, screen time generally, or particular categories of content—cause minors harm. The Legislature's findings speak of "social media platforms," "social

media use," and "problematic social media and internet use," A.B. 1709 § 1(a), (g), (n); they tellingly do not claim that a feed curated to a teenager's interests harms her in a way that a feed of the same videos arranged chronologically does not. The State's actual interest is apparent from the Act's own findings: it believes that depersonalized feeds are less appealing to teenagers and will therefore cause them to spend less time on social media. But making a disfavored medium less appealing to its audience—whether that medium is social media, video games, or comic books—is not a legitimate governmental interest, let alone a compelling one. The government violates the First Amendment even when it restricts speech it considers "deeply 'misguided' " or "likely to cause 'anguish' or 'incalculable grief.' " *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) (quoting *Hurley*, 515 U.S. at 574; *Snyder v. Phelps*, 562 U.S. 443, 456 (2011)).

124. Whatever interest the State may claim is diminished further by the Act's reach. The Act applies to any "natural person who resides in the state," § 22682(f), without regard to where that person is located when she receives TikTok's speech. California has no legitimate interest—much less a compelling one—in controlling the speech a Californian receives while sitting in Nevada, Oregon, or New York. A State "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State," and it "does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow v. Virginia*, 421 U.S. 809, 824-25 (1975).

125. Second, even if the State could invoke some general interest in minors' wellbeing, the Act does not use the "least restrictive means to further" that interest. *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). TikTok already provides the tools the State purports to want: a default 60-minute daily screen-time limit for users under eighteen; Family Pairing, through which parents may set screen-time limits, schedule breaks, filter keywords, enable Restricted Mode, and supervise their teen's experience according to their own judgment of their teen's maturity; muted push

notifications overnight for users aged thirteen to fifteen; and age-based content levels that divert mature content from younger users' feeds. *See supra* ¶¶ 61-72.

126. Those tools do for personalized feeds what the industry's voluntary rating system did for video games in *Brown*—they empower "parents who care about the matter" to decide for themselves the kind of experience that their teens have on TikTok's platform. 564 U.S. at 803. As in *Brown*, the State "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their [teen's] access" to personalized feeds, "but cannot do so." *Id.* "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Id.* Nor is it an answer that some parents may not use the tools available to them; the government "does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9. If the State believes parents are not making adequate use of those tools, it has less restrictive means available to it: it could "educat[e] children and parents" about those tools or "incentiviz[e] companies to offer" additional "voluntary" tools to assist parents. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024).

127. The Act's speech restriction sweeps even broader than S.B. 976 by prohibiting personalized feeds even where a parent has considered the question and concluded that a personalized feed is what she wants for her child. To be sure, TikTok maintains that S.B. 976's ban on its ability to provide personalized feeds to California minors without "verifiable parental consent," Cal. Health & Safety Code § 27001(a), is itself unconstitutional. But the State does not even attempt to explain why the undeniably less restrictive parental-consent regime it adopted only two years ago would be "ineffective to achieve its goals." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

128. Third, the Act is also overinclusive (and counterproductive). By banning *any* consideration of a user's past activity when recommending content, the Act *undermines* the State's interest in minors' wellbeing by making it more difficult for TikTok to avoid showing teenage users content that may be harmful to them or to show

them content that may be beneficial for them. TikTok's dispersion rules, which prevent a vulnerable teenager's feed from filling with one video after another on the same difficult subject, depend on the user's "previous interactions with media generated or shared by others"—which the Act forbids TikTok to consider. § 22682(b)(1). TikTok therefore cannot personalize feeds to reduce the amount of potentially harmful content a minor user consumes.

129. Moreover, the Act is overinclusive in barring personalization for *every* teenager under sixteen, *every* interest, and *every* topic, regardless of how much time the teenager spends on the platform, what her parents want, or whether she has experienced any harm at all. For example, it reaches TikTok's STEM feed—a feed the user affirmatively selects, confined to science, technology, engineering, and mathematics, and organized by relevance to the user rather than by chronology. That feed bears scant resemblance to the "addictive" feeds the Legislature appears to target; the Act sweeps it in only because it is prioritized "based, in whole or in part, on information provided by the user." § 22682(b).

130. The Act's failure to account for parental choice also makes it more overinclusive than the law invalidated in *Brown*. California's video-game law in *Brown* allowed minors to access the restricted games whenever "one parent (or even an aunt or uncle) says it's OK." 564 U.S. at 802. The Supreme Court nonetheless held that the law was "vastly overinclusive" as an aid to parental authority because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who care whether they purchase violent video games," and the law's "entire effect [was] only in support of what the State thinks parents ought to want." *Id.* at 804. A.B. 1709 does not merely fail to track what parents want—instead, it overrides parents who have affirmatively decided that a personalized feed is appropriate for their child. "This is not the narrow tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Brown*, 564 U.S. at 804.

131. Fourth, the Act is vastly underinclusive, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. The Act exempts services whose user interactions are limited to commercial transactions or consumer reviews, which appears to mean that an under-sixteen user may receive a personalized feed of product reviews and commercial advertisements, but not a personalized feed of science videos. Cal. Bus. & Prof. Code § 22682(c)(2)(A). The Act reaches only platforms that offer "an addictive feature as a significant part of the service," leaving all other "addictive features" that are not a "significant part" of the service unregulated. *Id.* § 22682(c)(1). And the Act defines an "addictive feed" to reach only "media generated or shared by users," *id.* § 22682(b), leaving untouched any "addictive feeds" consisting entirely of media generated by a platform itself or third-party content producers. Just as California in *Brown* "singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—[without any] persuasive reason," 564 U.S. at 802, A.B. 1709 singles out only some content and some platforms for disfavored treatment. Leaving the same features available to the same teens from favored speakers "is not how one addresses a serious social problem." *Id.*

132. In short, the Act is both overinclusive and underinclusive, which must mean that even the State recognizes that it is suppressing and chilling speech. But "the overbreadth in achieving one goal"—here, the goal of curbing addiction—"is not cured by the underbreadth in achieving the other," here, the law's focus on only some content and some platforms. *Brown*, 564 U.S. at 805.

133. The Act would fail intermediate scrutiny for similar reasons, even if that were the applicable standard. Under intermediate scrutiny, the State must prove that its regulation "furthers an important or substantial governmental interest," that the "governmental interest is unrelated to the suppression of free expression," and that the "incidental restriction on alleged First Amendment freedoms is no greater than is

essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968); *see McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests"). The Act fails each criterion. There is no substantial governmental interest in preventing minors from receiving personalized speech for the reasons explained above. The State's interest is not unrelated to the suppression of free expression, because the State's aim is to prohibit platforms from delivering a disfavored expressive product to a disfavored audience. And the restriction is far greater than is essential. The Act does not consider TikTok's existing safety features, applies to *any* use of information about the user's activity on the platform "in whole or in part" to recommend or prioritize content (even uses that clearly would be beneficial in reducing harm to minors), and excludes even the less restrictive (but still unconstitutional) parental-consent escape valve the State adopted two years ago in alleged furtherance of minors' interests.

**D. The Personalization Ban Also Violates the Rights of TikTok's Users.**

134. For the same reasons, the Act violates the First Amendment rights of TikTok's users to receive speech they wish to receive. Minors "are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citations omitted); *see Brown*, 564 U.S. at 794-95; *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) (students are "'persons' under our Constitution" and "are possessed of fundamental rights which the State must respect").

135. Social-media platforms are among "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). For a fifteen-year-old, a personalized feed is a powerful means to discover interesting, relevant, and useful speech that she did not know to search for. But the Act prevents her from receiving that speech *even if she wants to receive it* and *even if her parents want it for her*. The Act therefore resembles the law the Supreme Court condemned in *Reno*

under which "neither the parents' consent—nor even their participation—in the communication would avoid the application of the statute." *Reno*, 521 U.S. at 865; *see Ginsberg v. New York*, 390 U.S. 629, 639 (1968) (upholding statute that "does not bar parents who so desire from purchasing the magazines for their children"). The Legislature has described what it has done in its own words: it has "[e]stablish[ed] a minimum age requirement for social media use." A.B. 1709 § 1(n). The Act thus violates TikTok's users' First Amendment rights to receive expressive, personalized feeds. TikTok asserts these rights on behalf of its users, whose ability to receive TikTok's speech is inextricably bound up with TikTok's ability to deliver it. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (allowing booksellers to "allege[] an infringement of the First Amendment rights of bookbuyers"); *Craig v. Boren*, 429 U.S. 190, 194-97 (1976).

136. For all these reasons, TikTok is entitled to: (1) a declaration that the Act's prohibition on personalized feeds for users under sixteen, Cal. Bus. & Prof. Code §§ 22682(a)(1), 22682(b), and 22683(a)(1), violates the First Amendment of the U.S. Constitution as applied to TikTok, and (2) an injunction barring Defendant from taking any steps to enforce those provisions against TikTok.

**COUNT II**

**Violation of First and Fourteenth Amendments, as Applied—**

**Threatened Restrictions on the Expressive Autoplay Feature**

**(42 U.S.C. § 1983 and Equitable Cause of Action)**

137. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

138. Like a "website designe[r]," TikTok engages in "expressive conduct" through the design of its platform. *303 Creative*, 600 U.S. at 600. Just as a newspaper editor makes choices about how to design a front page, platforms like TikTok make protected expressive choices with respect to "how to display" content. *Moody*, 603 U.S.

at 716. A.B. 1709 violates the First Amendment by threatening many of TikTok's expressive design choices.

139. In particular, TikTok is designed so that users view content as a stream without needing to explicitly search for it or provide other substantive inputs. That design element is an expressive choice. TikTok generally presents the videos in its feeds one after another. When a user wishes to watch something new, he swipes up and another video appears on his screen and starts playing. The For You feed's recommendation system refines the content-personalization process in real time, adapting the content presented to a user based on her current interests. This natural and dynamic rather than segmented and sterile feed is essential to create TikTok's signature "For You Page" experience, which is centered on users discovering accessible, enjoyable, and appropriate content made by creators with whom a person may have no pre-existing relationship.

140. A.B. 1709 threatens this expressive design feature. The Act bars platforms from displaying content by "autoplay." Cal. Bus. & Prof. Code § 22682(a)(2). While the precise scope of this provision is unclear, TikTok has standing to challenge it because TikTok intends "to engage in a course of conduct"—providing a stream of videos in which users can swipe to continue watching additional videos without a defined end—that is at least "arguably proscribed by" the statute. *Susan B. Anthony List*, 573 U.S. at 161-62 (internal quotation marks omitted).

141. Just as the First Amendment "unquestionably shield[s]" the abstract "painting of Jackson Pollock," so too does it protect TikTok's expressive web-design features. *Hurley*, 515 U.S. at 569. Like a law banning "paintings" or "drawings" that alter appearances, *303 Creative*, 600 U.S. at 587, A.B. 1709 imposes a content-based prohibition on how platforms display content.

142. A.B. 1709's prohibition on "autoplay" cannot survive strict scrutiny. First, the State does not have a valid interest—let alone a compelling one—in making a disfavored medium (social-media platforms) less engaging to its users. "That the State

finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011). Otherwise, states could impose all manner of aesthetic restrictions designed to make movies, video games, and other disfavored media less appealing to minors. Such a concept is utterly foreign to the First Amendment.

143. Moreover, even if the Act's "autoplay" prohibition served a valid governmental interest in reducing minors' screen time, it would not be the least restrictive means of achieving that interest. Other measures—like parental controls on minors' usage of a platform—could accomplish the same goal.

144. For similar reasons, even if intermediate scrutiny were the applicable standard, the "autoplay" prohibition still would not survive: The State cannot show that the prohibition serves a substantial governmental interest "unrelated to the suppression of free expression" and that the "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377.

145. TikTok is therefore entitled to: (1) a declaration that A.B. 1709's ban on "autoplay," *see* Cal. Bus. & Prof. Code §§ 22682(a)(2), 22683(a)(1), violates the First Amendment of the U.S. Constitution, as applied to TikTok; and (2) an injunction barring Defendant from taking any steps to enforce this provision against TikTok.

**COUNT III**

**Violation of First and Fourteenth Amendments, as Applied—**

**Compelled Surrender of First Amendment Rights**

**(42 U.S.C. § 1983 and Equitable Cause of Action)**

146. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

147. A.B. 1709 forces TikTok to either (1) surrender its First Amendment right to curate content for under-sixteen users and implement expressive design features or

(2) "delete the account of a user under 16 years of age and any personal information associated with the user of the account." Cal. Bus. & Prof. Code § 22684(b)(1).

148. The Act purports to give TikTok a choice. Section 22684(b) provides that the deletion mandate "does not apply to a covered platform that permits a user under 16 years of age to create or maintain an account on the platform pursuant to paragraph (2) of subdivision (a) of Section 22683." That cross-referenced provision, in turn, permits under-sixteen accounts only if those accounts are provided no addictive feature—no personalized feed, no autoplay, and no feature the Attorney General later designates under Section 22685. So TikTok's options are: (1) surrender its First Amendment right to curate content for under-sixteen users and implement expressive design features or (2) delete every under-sixteen user's account and all personal information associated with it.

149. "In reality, [TikTok] is given no choice, except a choice between the rock and the whirlpool . . . ." *Frost v. R.R. Comm'n of Cal.*, 271 U.S. 583, 593 (1926). Because both options require TikTok to surrender its First Amendment rights as the price of avoiding an unconstitutional penalty, the Act's "deletion" provision is unconstitutional.

150. Although California is not directly compelling TikTok to delete anything, California "cannot do indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69 (1963)). The State could not *directly* compel TikTok to abandon its curation and design choices for under-sixteen users, or to delete those users' accounts and information without satisfying First Amendment scrutiny. It cannot do so *indirectly* by forcing the platforms to pick which right to surrender.

151. *First*, requiring TikTok to delete under-sixteen users' personal information triggers First Amendment scrutiny by making it significantly more difficult—if not impossible—for TikTok to provide the personalized expressive product that it otherwise would. Without access to users' personal information, TikTok might be unable to

provide users personalized content. In other words, A.B. 1709 might deprive TikTok of the input (i.e., personal information) necessary for it to provide the personalized expressive product that it seeks to provide, burdening TikTok's ability to speak in the way it wants to speak.

152. Hamstringing TikTok's ability to personalize content violates the First Amendment. After all, "[l]aws enacted to control or suppress speech may operate at different points in the speech process." *Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (citation omitted). The First Amendment applies to restrictions on the ability "to gather information," which is "antecedent" to one's ability to speak. *People for the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023) (internal quotation marks omitted). Just as a law taxing paper and ink burdens a newspaper's First Amendment rights, *cf. Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-92 (1983), requiring TikTok to delete under-sixteen users' personal information burdens "the creation and dissemination of information . . . within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570.

153. *Second*, requiring TikTok to delete under-sixteen users' accounts violates the First Amendment. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik*, 422 U.S. at 212-13 (citations omitted).

154. Preventing minors from spending time online is not one of these "narrow and well-defined circumstances"; to the contrary, there is no "precedent for state control, uninvited by the parents," over the constitutionally protected speech that minors may receive. *Brown,* 564 U.S. at 795 n.3. Laws requiring minors' accounts to be deleted prevent those minors from speaking themselves or receiving speech. Such speech-restrictive laws are reviewed for "strict scrutiny." *Id.*

155. Forcing TikTok to either (1) surrender its First Amendment right to curate content for under-sixteen users and implement expressive design features or (2) "delete the account of a user under 16 years of age and any personal information associated with the user of the account," Cal. Bus. & Prof. Code § 22684(b)(1), also infringes upon TikTok's and its users' freedom of expressive association.

156. As the party prohibited from disseminating speech to minors, TikTok may challenge A.B. 1709 based on the law's intrusion on TikTok's own right to speak to minors as well as TikTok's users' rights to receive speech from TikTok. *See, e.g.*, *Brown*, 564 U.S. at 789-90, 792-95 (finding dispositive, in First Amendment challenge by video-game producers, the fact that minors had First Amendment right to receive the speech in question).

157. The Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment," *i.e.*, "speech." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The freedom to speak would be rendered nugatory if individuals were—by virtue of having their accounts deleted—banned from speaking to one another, so "[t]he Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.*; *see also id.* at 622 ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). As a result, "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.*

158. A.B. 1709 severely burdens that right. TikTok seeks to provide its users a forum where they can create and engage with speech on topics "as diverse as human thought." *Reno*, 521 U.S. at 870. In providing that forum, TikTok also speaks with its users, "engag[ing] in expression" by providing "feeds" that are "personalized" to each individual. *Moody*, 603 U.S. at 716, 734. In joining TikTok's platform, therefore, users

"associate" with TikTok—and TikTok associates with users—"for the purpose of engaging in" the freedom of speech "protected by the First Amendment." *Roberts*, 468 U.S. at 618.

159. In forcing TikTok to either (1) surrender its First Amendment right to curate content for under-sixteen users and implement expressive design features or (2) "delete the account of a user under 16 years of age and any personal information associated with the user of the account," Cal. Bus. & Prof. Code § 22684(b)(1), A.B. 1709 imposes a "substantial restraint upon the exercise by [TikTok and its users] of their right to freedom of association," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). It is thus subject to strict scrutiny. *See id.* at 460-61 ("state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny").

160. Section 22684(b)(1) imposes content-based restrictions that trigger and fail strict scrutiny. Even if this provision were "facially content-neutral," it should "nonetheless [be] treated as a content-based regulation of speech" because it "cannot be justified without reference to the content of the regulated speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (per curiam) (internal quotation marks omitted). Indeed, the State's justification for § 22684(b)(1) is to prevent TikTok and other platforms from selecting and displaying content that users are likely to find interesting and engage with.

161. Section 22684(b)(1) fails strict scrutiny because it is not narrowly tailored to achieve a compelling state interest. *Reed*, 576 U.S. at 163.

162. The State cannot prove that it has a compelling interest in forcing TikTok to delete minors' accounts and personal information. And there are less-speech-restrictive means to prevent social-media addiction short of requiring platforms to delete the under-sixteen user's account and personal information. Other measures—like parental controls on minors' usage of a platform that TikTok already provides—could accomplish the same goal. And by A.B. 1709's own account, "direct, private communications between users" are not addictive. Cal. Bus. & Prof. Code

§ 22682(b)(5). Otherwise, they would not be excepted from the Act. Yet the deletion requirement would erase not only the features the Act deems addictive, but teens' accounts themselves.

163. A.B. 1709 would also fail intermediate scrutiny. The State has no substantial interest in preventing TikTok from providing users with personalized content. Moreover, total prohibitions on personalized feeds are substantially more burdensome than necessary to protect minors and their privacy. As noted above, the State could prevent social-media addiction without requiring TikTok to delete under-sixteen users' accounts and any personal information associated with those users.

164. For these reasons, TikTok is entitled to: (1) a declaration that Cal. Bus. & Prof. Code § 22684(b)(1) violates the First Amendment of the U.S. Constitution as applied to TikTok, and (2) an injunction barring Defendant from taking any steps to enforce that provision against TikTok.

**COUNT IV**

**Violation of First and Fourteenth Amendments, as Applied—**
**Unlawful Punishment of Expression Without Scienter**
**(42 U.S.C. § 1983 and Equitable Cause of Action)**

165. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

166. The Act punishes the dissemination of protected speech without regard to whether the speaker knew the facts that made the speech unlawful. A covered platform that "violates this chapter" is subject to a civil penalty of "[u]p to twenty-five thousand dollars ($25,000) per affected minor for a negligent violation." § 22686(b)(2). The Act separately commands every covered platform to "implement reasonable measures to ensure that users under 16 years of age are not provided any addictive feature," § 22683(b)—a freestanding duty of care, the breach of which is itself a violation of the chapter carrying per-minor penalties. Taken together, these provisions subject TikTok to a penalty of up to $25,000 for every person under sixteen who receives a personalized

feed—even where TikTok did not know, and had no reason to know, that the person was under sixteen—so long as a court later concludes that TikTok's efforts to ascertain age fell short of an undefined standard of reasonableness. Given TikTok's *millions* of users, that potential penalty amounts to massive liability even for unintentional, unknowing violations.

167. The Supreme Court has repeatedly explained that the First Amendment "condition[s] liability on the State's showing of a culpable mental state" in order to "reduce[] the prospect of chilling fully protected expression." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). A scienter requirement provides the "breathing room" that protected speech requires and guards against "the hazard of self-censorship." *Id.* (internal quotation marks omitted). *Counterman* rejected a negligence standard even for true threats—a category of speech the First Amendment does not protect at all—because an objective standard punishes a speaker who did not consciously disregard any risk and thereby deters the protected speech that lies near the category's borders. *Id.* at 69, 79-80 & n.5. If negligence is an insufficient basis for punishing *unprotected* speech, it is *a fortiori* an insufficient basis for punishing speech the First Amendment fully protects, like the personalized feeds that TikTok creates and disseminates.

168. *Counterman* is one of multiple Supreme Court cases rejecting the imposition of liability for the dissemination of speech without proof of a subjectively culpable mental state. In *Smith v. California*, the Supreme Court struck down an ordinance that made a bookseller liable for possessing obscene books regardless of whether he knew their contents, because a distributor held liable without knowledge "will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature." 361 U.S. 147, 153 (1959). Liability without knowledge would cause intolerable "self-censorship" on the part of the speaker. *Id.* at 154. Similarly, in *Ginsberg*, the Court upheld a law prohibiting the sale to minors of magazines deemed harmful to them because it was limited to "sales made 'knowingly,'" "[a]s is required

by *Smith*." 390 U.S. at 643. And in *United States v. X-Citement Video, Inc.*, the Court explained that "a statute completely bereft of a scienter requirement" as to the characteristics that make speech illegal "would raise serious constitutional doubts." 513 U.S. 64, 78 (1994).

169. The Act's punishment for even negligent violations falls below the constitutional floor. The negligence the Act punishes concerns a fact—the age of each member of TikTok's audience—that the medium does not reliably reveal and that TikTok cannot independently verify for all of its millions of users. The inevitable result, given the massive potential liability, is self-censorship of the sort that *Counterman* and *Smith* warned against: the rational course for a platform faced with that liability is to err on the side of withholding personalized feeds from anyone for whom a question about their age remains after the use of imperfect age-verification mechanisms. Platforms inevitably will be incentivized not to provide personalized feeds to at least some users sixteen and over, who otherwise would have a right to receive them. The State may not "reduce the adult population of [California] to reading only what is fit for children," *Butler v. Michigan*, 352 U.S. 380, 383 (1957), and it may not accomplish the same result indirectly by making it ruinous for TikTok to accidentally deliver a personalized feed to someone under sixteen.

170. Because the Act imposes liability for the dissemination of protected speech without proof of knowledge, it violates the First Amendment regardless of the level of scrutiny that governs the underlying restriction. A scienter requirement is not a tailoring consideration to be balanced against the State's interests; it is a constitutional precondition to punishing speech. *See Counterman*, 600 U.S. at 75; *Smith*, 361 U.S. at 152-55. In any event, the Act's negligence standard is not tailored to any legitimate interest. A knowledge requirement would fully serve any legitimate interest the State has in keeping personalized feeds from users whom a platform knows to be under sixteen. Imposing liability based only on negligence adds nothing to serve that interest

except an *in terrorem* effect of liability for platforms' honest mistakes—which is to say, it only increases the chilling effect of the Act.

171. For all these reasons, TikTok is entitled to: (1) a declaration that Cal. Bus. & Prof. Code §§ 22683(b) and 22686(b)(2) violate the First Amendment of the U.S. Constitution as applied to TikTok insofar as they impose liability for providing an addictive feature to a user under sixteen without proof that TikTok knew the user was under sixteen, and (2) an injunction barring Defendant from taking any steps to enforce those provisions against TikTok on any standard less than actual knowledge.

**COUNT V**

**Violation of the Supremacy Clause—**

**Preemption Under 47 U.S.C. § 230**

**(Equitable Cause of Action)**

172. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

173. Under 47 U.S.C. § 230(c)(1), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Congress made that command binding on the States: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). TikTok is a provider of an interactive computer service, *id.* § 230(f)(2), and the videos, live streams, and comments its users upload are information provided by other information content providers, *id.* § 230(f)(3).

174. Section 230(c)(1) bars liability where the defendant provides an interactive computer service and the law treats it as a publisher of information provided by another. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009). Section 230's protection from state liability is not limited to "defamation cases"; "many causes of action might be premised on the publication or speaking of what one might call 'information content.'" *Id.* at 1101. "Publication" for purposes of the statute "involves reviewing,

editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1102. In short, § 230 "precludes liability" when "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024).

175. Recommending, arranging, and displaying third-party content is the function of a "publisher." The Ninth Circuit has held that a platform's "recommend[ation]" features are "tools meant to facilitate the communication and content of others"—so liability premised on such features treats the platform as a "publisher." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019); *see id.* at 1099 (holding defendant was "entitled to immunity under the plain terms of Section 230 and [Ninth Circuit] case law as a publisher of third-party content"). And the Ninth Circuit this year held that "matching users with content *is publishing conduct*, even when the user has not requested the content," and that engagement-driven recommendation algorithms are "the work of publishers." *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1167-69 (9th Cir. 2026). A publisher "does not cease to be a publisher simply because it prioritizes engagement in sorting its content." *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) (holding that "the fact that Facebook uses an algorithm to achieve the same result of engagement does not change the underlying nature of the act that it is performing") (quoting *Barnes*, 570 F.3d at 1102).

176. The Act imposes liability for exactly this sort of publishing conduct. It defines an "addictive feed" as one in which "multiple pieces of media generated or shared by users are . . . *recommended, selected, or prioritized for display* to a user." Cal. Bus. & Prof. Code § 22682(b) (emphasis added). Liability under the Act therefore turns entirely on which third-party videos TikTok displays, to whom, and in what order. Thus, the duty the Act imposes—to refrain from selecting or prioritizing third-party videos for users under sixteen based on information about those users—"derives from" TikTok's

"conduct as a publisher," *Calise*, 103 F.4th at 740 (internal quotation marks omitted); it can be satisfied only by changing which third-party content TikTok publishes to whom. By imposing liability on TikTok for performing the functions of a publisher, it "treat[s] the defendant as the 'publisher' . . . of content provided by another" in violation of § 230. *Barnes*, 570 F.3d at 1102.

177. The Act's autoplay prohibition, § 22682(a)(2), is preempted for the same reason. Whether and when to present the next third-party video is a decision "whether to publish" that content. *Barnes*, 570 F.3d at 1102.

178. So is the Act's deletion mandate. Section 22684(b)(1) requires TikTok to "delete the account of a user under 16 years of age and any personal information associated with the user of the account." The Act's only escape from deletion, § 22684(b)(2), requires TikTok to abandon its exercise of a different publishing function—the selection and arrangement of third-party content for those users based on users' information. The Act's requirement thus runs afoul of § 230.

179. The Act also is inconsistent with the policies Congress declared in § 230 itself: "to encourage the development of technologies which maximize *user control* over what information is received by individuals, families, and schools who use the Internet and other interactive computer services," and "to remove disincentives for the development and utilization of blocking and filtering technologies *that empower parents* to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(3)-(4) (emphasis added). Congress chose to protect minors by empowering parents, not by authorizing States to dictate what platforms may publish to them.

180. TikTok may enjoin enforcement of a preempted state law through the equitable cause of action recognized in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015). TikTok is therefore entitled to: (1) a declaration that Cal. Bus. & Prof. Code §§ 22682(a)(1)-(2) and (b), 22683(a)(1), 22684(b)(1), and 22686 are preempted by 47 U.S.C. § 230 insofar as they impose liability on TikTok for performing

publishing functions—recommending, selecting, prioritizing, automatically playing, or continuing to publish information provided by other information content providers; and (2) an injunction barring Defendant from taking any steps to enforce those provisions against TikTok on that basis.

**COUNT VI**

**Violation of First and Fourteenth Amendments, as Applied—**
**Void for Vagueness**
**(42 U.S.C. § 1983 and Equitable Cause of Action)**

181. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

182. The Constitution's Due Process Clause requires that a law provide "fair notice of the conduct it punishes" and protects against a law's "arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."). A statute that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008), "flouts" this " 'first essential of due process,' " *Johnson*, 576 U.S. at 595, and is unconstitutionally vague.

183. Those requirements apply with special force here. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television Stations*, 567 U.S. at 253-54; *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) ("Our concern here is based upon the 'potential for arbitrarily suppressing First Amendment liberties.' ").

184. First, the Act does not explain what "reasonable measures" TikTok must take to keep its offerings from Californians under sixteen. Cal. Bus. & Prof. Code § 22683(b). Nor does it define "autoplay." *Id.* § 22682(a)(2). Such uncertainty leaves TikTok to guess whether it has sufficiently complied with the Act, risking the possibility

that the State might disagree with its determination and impose penalties for guessing wrong. Consequently, A.B. 1709's ambiguity leaves as the safest course for TikTok to disable its expressive design features for more users than the law actually requires. A.B. 1709 therefore forces TikTok, out of an abundance of caution, to restrict even more speech than would be required by A.B. 1709 "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). That is a textbook chilling effect on speech.

185. A.B. 1709's fallback age-verification requirement is also unconstitutionally vague and chills TikTok's speech. The Act's age-verification requirements begin by requiring "a covered platform" to "verify the age" of any user "pursuant to the Digital Age Assurance Act" before providing an "addictive feature." Cal. Bus. & Prof. Code § 22684(a)(1). If a platform "is unable to verify the age of the user" under that process, it must "instead rely on the age determination with respect to the user made pursuant to subparagraph (B) of paragraph (1) of subdivision (a) of Section 27001 of the Health and Safety Code." *Id.* § 22684(a)(2). The Act never explains what it means to be "unable to verify" a user's age. That gap has real consequences for TikTok. If TikTok treats too few users as under sixteen, it risks penalties of up to $50,000 per affected minor. *Id.* § 22686(b). If it treats every user whose age it cannot "verify" as under sixteen, it must strip personalized feeds from large numbers of sixteen- and seventeen-year-old users and adults who are entitled to receive that speech. A.B. 1709's failure to say when the fallback applies leaves TikTok no choice but to restrict far more expression than the Act may in fact require. By forcing TikTok to "restrict[] [its] conduct to that which is unquestionably safe," A.B. 1709's vagueness offends due process. *Baggett*, 377 U.S. at 372. And if A.B. 1709's due-process violations are not enjoined, "'the free dissemination of ideas may be the loser.'" *Id.* at 379 (quoting *Smith*, 361 U.S. at 151).

186. Compounding the dangers of these vague substantive provisions is the Act's failure to give adequate notice of the scope of liability. The Act imposes civil liability on a "covered platform that violates" its requirements, with penalties of up to

$50,000 "per affected minor for a knowing violation" or up to $25,000 "per affected minor for a negligent violation." Cal. Bus. & Prof. Code § 22686(b). Nowhere does the statute define the unit of a "violation." TikTok thus cannot ascertain the scope of the penalties it faces. That flouts the "[e]lementary notions of fairness enshrined in our constitutional jurisprudence" requiring a person to receive "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996) (recognizing this limitation in enforcing the Due Process Clause's limits on punitive damages). A.B. 1709 does not give a platform adequate notice to ascertain the penalties it faces.

187. Further, the Act's failure to specify what constitutes a "violation" "vests virtually complete discretion in the hands" of the government officials responsible for enforcing the Act. *Kolender*, 461 U.S. at 358; *see also Baggett*, 377 U.S. at 372.

188. The Act bans "autoplay" without defining it—leaving platforms to guess whether California regulators will apply the statute to platforms' choices with respect to how they present their content. The lack of any definition in the statute renders this provision unconstitutionally vague. It will chill speech, as platforms are pressured to err on the side of caution and not provide any expressive product that could be deemed "autoplay."

189. The Attorney General also has "complete discretion," *Kolender*, 461 U.S. at 358, to "defin[e] in regulations" the meaning of the term "addictive feature," Cal. Bus. & Prof. Code § 22682(a)(3). The only potential limit on the Attorney General's discretion to decide what counts as an "addictive feature" is the Act's open-ended description of "psychologically exploitative features intended to maximize engagement that foreseeably lead to compulsive use." *Id.* § 22682(a). The same official who decides what features might fall within that capacious description is also charged to enforce the Act with penalties of up to $50,000 per affected minor. *Id.* § 22686(a)-(b).

190. That arrangement presents the very danger the vagueness doctrine exists to prevent. The "more important aspect of the vagueness doctrine" is perhaps " 'not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Such discretion is even more likely to violate the Constitution when a government official may wield their authority to suppress or chill speech. In *Coates v. City of Cincinnati*, 402 U.S. 611 (1971), for example, the Supreme Court struck down an ordinance that made it a criminal offense for "three or more persons" to assemble in a manner that a police officer finds "annoying to persons passing by." *Id.* at 612. And in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Court invalidated a loitering ordinance that failed to give law enforcement officers sufficient standards by which they could judge whether an individual had no "apparent purpose" for remaining in a particular location. *Id.* at 60-64.

191. Like the law in *Coates*, which improperly let officers decide what kind of assembly is "annoying," A.B. 1709 improperly allows the Attorney General to decide which of a platform's expressive design features are "addictive" and therefore forbidden. Like the ordinance in *Morales*, A.B. 1709 does not provide sufficient standards to limit the Attorney General's discretion. Importantly, A.B. 1709's vagueness cannot be cured by limits that the *enforcing official* adopts for itself and remains free to revise, expand, or reinterpret. *See Morales*, 527 U.S. at 60-64. As a result, TikTok may challenge that vagueness *now*—meaning before the Attorney General adopts its regulations.

192. That TikTok's challenge is not premature is especially apparent given that, in the First Amendment context, the Supreme Court has long refused to tolerate laws that vest "unbridled discretion in a government official over whether to permit or deny expressive activity," and has allowed "one who is subject to the law [to] challenge it" before even applying for a permit or license, for example. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988). That is because "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint,

intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757. Nor may a court presume that an official vested with such discretion "will act in good faith and adhere to standards absent from the [law's] face," for "this is the very presumption that the doctrine forbidding unbridled discretion disallows." *Id.* at 770.

193. A.B. 1709's vague delegation chills speech in much the same way. Because the Attorney General may designate additional "addictive features" at any time, and because each designation exposes TikTok to penalties of up to $50,000 per affected minor, TikTok cannot know which of its expressive design features may be forbidden as "addictive" tomorrow. The safest course is to restrict expression beyond what the Act's enumerated terms require. The vagueness doctrine exists to protect parties from having to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 372 (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

194. For all these reasons, TikTok is entitled to: (1) a declaration that A.B. 1709's "reasonable measures" requirement contained in § 22683(b) is void for vagueness under the Fourteenth Amendment of the U.S. Constitution, as applied to TikTok; (2) a declaration that A.B. 1709's age-verification requirement in § 22684(a)(2) is void for vagueness under the Fourteenth Amendment of the U.S. Constitution, as applied to TikTok; (3) a declaration that A.B. 1709's imposition of liability in § 22686(b) for an undefined unit of "violation" is void for vagueness under the Fourteenth Amendment of the U.S. Constitution, as applied to TikTok; (4) a declaration that A.B. 1709's undefined prohibition on "autoplay" in § 22682(a)(2), and its delegation of open-ended authority to the Attorney General to designate additional "addictive feature[s]" in § 22682(a)(3), are void for vagueness under the Fourteenth Amendment of the U.S. Constitution, as applied to TikTok; and (5) an injunction barring Defendant from taking any steps to enforce those provisions against TikTok.

**COUNT VII**

**Violation of The Fourteenth Amendment and the Commerce Clause—Extraterritorial Regulation of Expression**

**(42 U.S.C. § 1983 and Equitable Cause of Action)**

195. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

196. "[T]he Constitution takes great care to provide rules for fixing and changing state borders." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) (citing U.S. Const. art. IV, § 3, cl. 1). That design reflects the bedrock principle of equal sovereignty among the states.

197. From our horizontal separation of powers flows limits on the regulatory authority that one state has over another. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."). Courts called upon to "referee disputes about where one State's authority ends and another's begins . . . recognize[] the usual 'legislative power of a State to act upon persons and property within the limits of its own territory.'" *Nat'l Pork Producers*, 598 U.S. at 376 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).

198. The negative implications of the Commerce Clause incorporate that limitation on state power. U.S. Const. art. I, § 8, cl. 3. Under Supreme Court precedent, the Commerce Clause "contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Producers*, 598 U.S. at 368 (internal quotation marks and brackets omitted). Among the state economic regulations that this command forbids are those that regulate "wholly out-of-state conduct." *Sam Francis Found. v. Christie's, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015) (en banc).

199. Although the Supreme Court has made clear that the dormant Commerce Clause does not necessarily prevent "state laws with extraterritorial effects," *Nat'l Pork Producers*, 598 U.S. at 373 (quotation marks omitted), the Court did not decide whether "'a law that *directly* regulated out-of-state transactions by those with *no* connection to the State' could violate the dormant Commerce Clause or some other constitutional limitation," *Flynt v. Bonta*, 131 F.4th 918, 924 (9th Cir. 2025) (quoting *Nat'l Pork Producers*, 598 U.S. at 375-76 & n.1).

200. Under Ninth Circuit precedent, the dormant Commerce Clause prohibits such a regulation. *Sam Francis Found.*, 784 F.3d at 1324. *Sam Francis Foundation* involved a California law requiring, in relevant part, "the payment of royalties to the artist after a sale of fine art whenever 'the seller resides in California.'" *Sam Francis Found.*, 784 F.3d at 1323 (quoting Cal. Civ. Code § 986(a)). The en banc Ninth Circuit held that "the royalty requirement, as applied to out-of-state sales by California residents, violates the dormant Commerce Clause." *Id.* That was because it regulated "wholly out-of-state conduct," *id.* at 1324, such as when a California resident bought and sold art outside of the State, *id.* at 1323.

201. A.B. 1709 has the same constitutional defect. The problem follows from the Act's use of a residence-based, rather than a location-based, definition of "user" to determine the scope of its requirements. Cal. Bus. & Prof. Code § 22682(f). Under the Act, " '[u]ser' means a natural person who resides in the state and accesses or seeks to create an account on a covered platform." *Id.* And if TikTok "provide[s] an addictive feature to a user who is under 16 years of age," *id.* § 22683(a)(1), it faces liability under the Act. There is no requirement that the California resident be in California or that the "addictive feature" is provided in California.

202. When TikTok offers its products to users it engages in "commerce" within the meaning of the Commerce Clause. *Cf. Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 432-33 (9th Cir. 2014) (applying dormant

Commerce Clause analysis to a requirement that CNN make available closed captioning for videos posted on its website).

203. The result is that California regulates commercial exchanges between TikTok and Californians under sixteen even if those exchanges occur entirely outside the State. Under A.B. 1709's terms, TikTok faces penalties if it provides its For You feed to a fifteen-year-old California resident who downloads and uses TikTok for the first time while attending summer camp in New England. *See* Cal. Bus. & Prof. Code §§ 22682(f), 22683(a)(1), 22686. That expressive exchange occurs entirely outside California. Yet TikTok could be liable in California for its messaging. *See id.* §§ 22683(a)(1), 22686.

204. California cannot justify its overreach. A state "may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Bigelow*, 421 U.S. at 824-25. Nor does the State "acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Id.* at 824.

205. TikTok is therefore entitled to: (1) a declaration that A.B. 1709's prohibition on providing its platform to California residents no matter where they are located, Cal. Bus. & Prof. Code §§ 22682(f), 22683(a)(1), violates the Due Process Clause of the Fourteenth Amendment and the Commerce Clause of the U.S. Constitution; and (2) an injunction barring Defendant from taking any steps to enforce the Act against TikTok for the platform's communications with users outside the State.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Declare that the challenged provisions of California Business & Professions Code—§§ 22682(a), 22682(b), 22682(f), 22683, 22684, 22685, 22686—are unconstitutional as applied to Plaintiffs and/or preempted by 47 U.S.C. § 230(c)(1);

B. Enjoin Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the challenged portions of the Act against Plaintiffs; order Defendant to provide, by personal service or otherwise, actual notice of this order to all personnel who are responsible for implementing or enforcing the Act;

C. Enter judgment in favor of Plaintiffs on each listed count;

D. Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims; and

E. Award Plaintiffs all other such relief as the Court deems proper and just.

Dated: November 4, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theodore J. Boutrous Jr.*
Theodore J. Boutrous Jr.
Nicola T. Hanna
Poonam G. Kumar
Blaine H. Evanson
Miguel A. Estrada

*Attorneys for Plaintiffs TikTok Inc. and TikTok USDS Joint Venture LLC*